Our second case today is United States v. Scott. Ms. DeLauro, good to have you here. Thank you, Your Honor. Good morning. May it please the Court, Jackie DeLauro for Javion Scott. Your Honor, the threshold question in this case is whether the search of Javion Scott's home was driven by law enforcement and thus subject to the Fourth Amendment balancing test of Knights and Sampson, or whether instead it was driven by a special need of probation beyond law enforcement and subject thus to Griffin's special needs analysis. By every measure this was a law enforcement search. At 7.20 in the morning, nine officers from four different law enforcement agencies came to execute a warrantless search on Mr. Scott's home. They had no warrant and no reasonable suspicion that he was violating the conditions of his post-release supervision, nor did they have any reasonable suspicion that he had committed a crime. Is reasonable suspicion the proper test? I think, Your Honor, that within the context of the Griffin special needs question, reasonably related to the terms of supervision is what's at issue. And I think when we talk about the Knights and Sampson balancing test that we believe applies because this was directed by law enforcement, the relevant question is whether the government's legitimate interest in law enforcement outweighed Mr. Scott's reasonable expectation of privacy. In cases where it has been clearly and unambiguously expressed to a supervisee that he is subject to suspicionless and warrantless searches, as in Sampson v. California, the Supreme Court has upheld suspicionless searches. But here because Mr. Scott was never in fact informed that he was subject to suspicionless warrantless searches, that his reasonable expectation of privacy is that he would not be subject to those kinds of searches. In fact, the court in Knights and the court in Sampson said that the conditions set forth by statute otherwise were key to their decision. It wasn't just some balancing test out of the air. That's absolutely right, Your Honor. And in fact, with the conditions, the statute that Mr. Scott was subject to in fact assures him that the supervisee, quote, may not be required to submit to any other search that would otherwise be unlawful. And of course, suspicionless searches very much echo the writs of assistance against which the Fourth Amendment was drafted. You say there's no suspicion here of any kind on this record? Courtney Thomas testified that the reason she selected J.B. Ann Scott was because she was instructed by her supervisors to pick some of her supervisees to be searched as part of this Operation Spring Sweep. So this is not a situation. There have been cases... But she said he wore all this expensive jewelry and stuff. She did mention that. And that was suspicious, didn't she? She said at the suppression hearing that he, quote, wore flashy jewelry and didn't have a job. But she later admitted at Joint Appendix, I believe it's 120, yes, that Mr. Scott was in fact working. He was working for his mother's transportation company. And she was not satisfied with the hours of that labor, but he was working and did have a job. She also didn't express any reason to believe that Mr. Scott had either stolen the jewelry or that it was proceeds from sales of drugs or anything else that would indicate a violation of his conditions of supervision. What did the judge find as to this? The judge, the magistrate judge is the only one who, in the statement of fact, said that Courtney Thomas selected him because he wore flashy jewelry and had no job. But to the So that's the finding, isn't it? If that's the factual finding, we do believe it's clearly erroneous. Well, is it the factual finding? Yes, I think it is. The magistrate judge found that. That's right. That's right. Well, the magistrate judge, did the magistrate find that or recommend that finding to the district court? It was in the context of a memorandum and recommendation. But then the district court adopted the report. Yes, that's correct. And recommendations. That's correct. So the district court adopted the finding. Yes. So then that's the finding of the district court as to why they did this. And then don't we review that finding for clear error? And I think it is clear error, Your Honor. But is that the appropriate standard of review? Yes, yes. You agree to that? For factual findings, that's correct. Factual findings, clear error, and that's the finding. Read it again to us. It's at the memorandum and recommendation. I can pull the exact language. But that Courtney Thomas selected Mr. Scott because he wore flashy jewelry and didn't have a job was the essence of the factual finding. Right. So that's the finding that we review for clear error. That's correct. If it's not clear error, you lose? I don't think so because I think it's the totality of the circumstances test. Well, how can we substitute our judgment on facts for what the court found? I think first of all that... We have to accept the finding of the court. I think if the factual finding is clearly erroneous, this court can reverse it. No, if it's not clearly erroneous. And if it's not clearly erroneous, I think that that finding standing alone is not sufficient to outweigh the rest of the circumstances of the search. What about the fact that he was a level 2 sex offender because of his gang affiliation and the office policy permitted warrantless searches every 180 days based on that fact. Isn't that part of the calculus here too as well? I think it can be part of the first, the Griffin special needs analysis because he was subject to one warrantless search every 180 days, subject to both the level 2 sex offender policy. And then the government had asserted the gang policy as well. But there is evidence in the record, significant evidence in the record, that he should not have been subject to that condition. Mr. Scott was not in a gang. Courtney Thomas, his supervising officer, had no current information that he was in a gang. Okay, but he was a sex offender that put him within this office policy. That's correct. But Courtney Thomas, importantly, never testified that she wanted to search Mr. Scott anyway and simply submitted his name. It was convenient that Operation Spring Sweep was happening at the same time. There was something in the record about these coming up on these 180 days. There were still 45 days remaining, so that's still a month and a half before that search. It was 135 days. So there were, I believe, 45 days remaining of 180. So that's 135 had passed. That's 135 had passed. That's right. Well, you wouldn't, if you're going to do a search, you wouldn't time it to be right on 180 days, but then they'd know exactly when it's coming if you're going to do a warrantless search. No, we believe it's just another factor to be considered to suggest that this was not actually motivated by the special needs of the probation office, that this really was a law enforcement search seeking warrantless searches of homes of probationers and supervisees with a law enforcement purpose of finding guns or drugs that was not tailored to Mr. Scott. The district court found it was not a law enforcement search. The district court applied Griffin's analysis, again, through that M&R procedure and the district court adopting what the magistrate judge did. But the district court never actually, nor the magistrate judge, ever reached the Knights and Sampson balancing test because it applied Griffin. But I believe that Griffin only applies when there is, in fact, a special need beyond law enforcement, and that simply was not established here. The sweep was called a U.S. Marshall search in probation records. That's at JA 148 and 149. And probation officers here... How many searches were executed that day? I believe there were hundreds of searches that were executed that day. Hundreds? I'm sorry. I think there were 52 locations and they landed 51 arrests. We did submit some press releases where exhibits in the district court... Is that good evidence, what you have in the press releases? Yes, because it was put out by the law enforcement agencies that conducted Operation Spring Sweep. So that's like a statement of the defendant or something? Is that submissible, that kind of stuff? Well, we submitted it to the magistrate judge and to the district court on the basis that this is information about what was really going on in Operation Spring Sweep. This is what they said was going on? Yes. Was there an objection? No, I don't believe there was an objection to the press release. So you're confident we can consider that? Yes. Is all... 51... 52 searches? I believe there were 52 searches and 51 arrests were heralded in the press release. All of them were in Cumberland County? Yes, I think that's right. But the Marshal Service organized it all? That's right. The Marshal Service, there were multiple law enforcement offices. Is there any record that shows what their primary purpose of the Marshal Service was in organizing these 52 raids? Well, I think those press releases are powerful evidence of it. They're trying to clean up the streets. They're trying to scare everybody or something? Why are they doing 52 raids in one day in Cumberland County, North Carolina? I think they were looking for guns and drugs and they had some... I guess there was someone who had escaped from supervision from Florida that they were looking for. Okay. But these were all law enforcement purposes. I understand. I'm just trying to figure out what the record shows as to why it was done and what was done. But doesn't Griffin really take us back to the authorizing statute here, the North Carolina General Statute 15A 1368.4B18? I mean, if the search complies with a constitutional state law, which this is, it's okay under special needs, isn't it? I think that's correct, Your Honor. Only if it is, in fact, a special need beyond ordinary law enforcement. And that's coming from Griffin itself. Okay. What in the language of Griffin says that it has to be demonstrated as a special need separate and apart from complying with a constitutional state law? That is the articulation Griffin used. Special needs beyond the normal need for law enforcement. Beyond the need? Yes, that's right. And in fact, Griffin instructed at 875 that the interpretation of that statute by state courts and by state law enforcement officers was important and should be considered. And I think that's relevant here because we have Courtney Thomas purporting to execute this delegation of her supervisory authority over Mr. Scott. But it's undated. She doesn't delegate a specific officer. Well, she could do that, couldn't she? Why couldn't they do that? You're saying it had to be the specific officer? I think having the assigned supervising officer. But the assigned officer could change day to day. I mean, the officer can retire, get fired, pass away. Sure. And you get a new officer. Sure. And I think it's connected. So you're saying that if you don't have the one that's named, it can't do anything. So I think it still needs to be reasonably related to the purposes of supervision. And whereas here you have a search where... But this thing about the name of the officer, that doesn't make much sense to me. I think it's relevant for two reasons, Your Honor. The first being that when a supervising officer is present, that is the person who knows the supervisee's case, knows his conditions, knows his history, knows his characteristics. And so the search is executed for a purpose that that officer has determined is reasonably related. Let's go to the statute. Yes. And does the statute require that the warrantless search be performed, quote, by a post-release supervision officer? By a post-release supervising officer. Yes, sir. So let's assume for purposes of this argument that it could be any supervising or any probation officer. Sure. Did a probation officer conduct this search? Four probation officers were present, Your Honor. Did they conduct the search? They were present. I believe everyone was searching, from my understanding. So did they search? I believe they searched, as did an ATF officer, Jarrett Wishon. So I believe everyone was searching simultaneously, including canine dogs. So it would be reasonable to assume they were searching for probationary supervisory purposes. Well, I think, Your Honor, it's interesting because in the record, Becky Staley, who was the... She was asking, she saw children's toys in Mr. Scott's apartment and she had to ask whether he was allowed to have children visit his home. That's a JA-199. And I think that's telling for why either the assigned supervising officer should be there or the person who is present should have been briefed because that would have spoken powerfully to an idea that this is actually a supervision search that we believe is necessary to effectuate this special need. Now this supervisor... I'm sorry. No, no. I was going, is this supervising officer somebody from Cumberland County or just some statewide officer? She was. Becky Staley was from Cumberland County, as was Courtney Thomas, who was the assigned supervising officer. They're Cumberland County officers. Yes. But Courtney Thomas, who was Mr. Scott's supervising officer, explained that she never briefed either Billy Drawhorn or Becky Staley, who were both named on the delegation form that she tried to execute. Okay. Let's get back to the case law here, though. Yes. And our recent case of Curry that came out in the beginning of September? Yes. I think it might have been Judge Richardson, but I'm not sure. I think it was. And didn't our court say that supervising in the post-release context is a special need even though it overlaps with the general law enforcement, execution of law enforcement? The court recognized that these are not exclusive propositions. Quite often they do overlap. And didn't we in Curry specifically recognize that the post-release supervision is a special need? I think it certainly can be, and I think Your Honor's articulation of quite often is exactly right. If, in fact, this is a search that's motivated by the probation office for probation-related reasons, it's a special need. Well, if four probation officers there that you just told me engaged in the search, there'd be no reason for them to be there if it was a general law enforcement search that marshals were running. I think they were there in an effort to address, to deal with the court's case law and the case law from the Supreme Court to act sort of as a Trojan horse. Anything wrong with that? I think when the search is, the motivation for the search is not coming from the probation office, but is instead coming from law enforcement, as it was in Sampson. That's why the Sampson court didn't rely on Griffin. That was a person who was on parole. But they had no such limitations on the search there. There was no limitation that was based on supervisory needs in Sampson. You couldn't search any time for any reason, right? You could, and the reason he was searched was simply because he was on parole, but he was searched by a law enforcement officer. And in Knights, even though he was someone who was on probation, it involved a tip from law enforcement. But it was still without the restrictive conditions that we find here. That's correct. But Knights, again, the Griffin analysis wasn't used in Knights despite the fact that Knights was, in fact, on probation. So I think the selection of the analysis is really the critical point here. And because the special needs exception, the special need beyond law enforcement of the supervising office, was not at issue here. This was really driven. Did these probation officers run around town to all the other places where there weren't supervisees and assistant marshals in this suite? Or did they just go to the places that they had supervisees and do a search for their reasons? There were no person searched who were not subject to supervision. But it is interesting that there was no effort made to pair the supervising officer with the supervisee. And so even though Becky Staley did have supervisees of her own, she was not present for those searches. She was present for Mr. Scott's search. If you had had the assigned supervisor, Officer Thomas, present, would the search have been constitutional under the special needs exception? I think it would have been a much harder case for us because that would be a situation. I'm going to kind of ask you to take a position on that. Do you believe it would have or it would not have, and tell me why. I think that probably would have been a powerful factor, but ultimately this still, if no other circumstances had changed, this was still driven by law enforcement because of the way that it initiated and because Courtney Thomas never said I would have conducted the search, but for my supervisors contacting me about Operation Spring Sweep. Because every supervisee has different search conditions, searchers need to know what's a violation for a particular person. So in this case, Mr. Scott's having children's toys in his apartment was a very relevant thing. The officers who were present didn't know whether this was a violation of his post-release supervision or not, and that is certainly a problem. Your Honor, so we would ask this court to vacate Mr. Scott's conviction and reverse the district court's denial of his suppression motion. I reserve the remainder of my time. Thank you, Ms. DeLauro. Thank you, Your Honor. Mr. Rubin. Good to see you, Mr. Rubin. Thank you, Your Honor. I'm pleased to be here. Good morning, and may it please the court. I'm here on behalf of the United States, and I intend to spend a lot of time talking about a Fourth Circuit case that somehow hasn't come up this morning, this court's decision in Majette, which I would submit to you controls most, not every single one, but most of the issues that my colleague raised. But I want to talk about the facts a little bit first, because I think my colleague and I are looking at a slightly different record here. So I want to start with that press release. Judge King, I think your point is well taken about whether the court can consider it. I will say we didn't object to it below, that's true. But to the extent we're looking at the press release, I just have to note that the description of it isn't quite accurate, because the press release lists the accomplishments of the entire operation, which was not just probation searches. They were searching for probation absconders, and they were also searching in serving warrants. So when they say that there were 51 individuals arrested, that was in the entire operation. Now, it isn't broken down into how many, but I just want to make it clear that we don't have something in the record that says they did 52 searches and had 51 arrests come from those searches. That's just not in this record. I highly doubt that's true. You can't take that from the press release. She said there were 52 searches. That is in the press release. There were 52 searches. The 74 high-risk probation parole searches attempted, 52 searches completed, is in the press release. And I would note something else in the press release. There's various law enforcement officers are talking about this operation. And one that I think, since we're talking about the press release, is from the Secretary of Public Safety in North Carolina, who's over this entire apparatus for probation and parole. Keeping our community safe requires the collaboration of local, state, and federal law enforcement agencies. No agency can do it alone, and this operation is a prime example of that cooperation, and we are grateful for the daily support of all of our partners. Now, this allows me to turn to Majette. Okay, yeah, and that's what I wanted to ask you about, Majette. Your point really is that Majette closes the door on everything here. Isn't it that Majette addresses the statute at issue and that it says that it establishes the reasonable relationship? And you're saying that's the end of the case. I think there's a little more. I can't come up here and say that Majette is, you should literally just cite Majette and affirm the decision, but I do think that it forecloses. Okay, what more do we need other than Majette? And if I can address that by first very quickly tackling what it does address, and a few of the things my colleague argued this morning are foreclosed. So first of all, this statute is not actually the exact same statute. It was a probation statute in Majette, but it's materially, if you compare the two, it's materially identical. The only difference between them is that the one in Majette required that the search be done for purposes specified by the court. The reason that's absent here is this is a mandatory condition for sex offenders, so the court doesn't choose to allow it. So in terms of whether this statute complies with the Fourth Amendment, see Majette. The second thing is whether it requires reasonable suspicion. Majette was what, 2008? 2007. 2007, Judge Niemeyer. That's right, Your Honor. Judge Traxler and somebody else. It was Judge Niemeyer, Judge Traxler, and Judge Sedd, Your Honor. And Majette also held, first of all, that that statute allowed for suspicionless searches, so as a matter of statutory interpretation, it does not require reasonable suspicion, and that also that it complied with the Fourth Amendment in doing so. And so those arguments about whether reasonable suspicion was required here by the statute or by the Fourth Amendment, I would submit to you are, in fact, foreclosed. Now, the main thing that we have that I don't think was present in Majette, it just wasn't argued, is this issue about a probation officer versus my probation officer. And so I'll move to that. There are a few more points before that that I'll come back to on that, but this issue of whether his probation officer needed to be there, I want to start with the fact, and this is, again, an area where we disagree on the facts. From my colleague's argument, it almost sounded like Courtney Thomas, the probation officer, was very uninvolved in this. She personally selected this offender for this search based on things related to her supervision of him. And we know that because that's exactly what she said. She said he's wearing all this flashy jewelry, he's wearing expensive-looking shoes, he has a grill in his mouth, he has all these things that indicate a lot of money, and he doesn't have a job, which he was also required to have as part of his probation. My colleague mentioned later in the hearing they went back and forth a bit about whether he had a job, but ultimately what Ms. Thomas said was he was trying to work at 3 a.m. for his mom in a delivery van, but it just wasn't working out. He had unstable employment, he wasn't working. So her assessment of him was he has expensive-looking stuff and isn't working. And I would submit to you that that is an indicator to a probation officer that maybe there's illegal activity going on. The second thing, the argument that she would not have chosen him for this search, but for Operation Spring Sweep, she said she would have chosen him for this search, or for a search because she had to within the next 45 days. And actually, I ran this through the calendar just to check, by the time the operation happened it was closer to 35 days to when she was mandatorily required to search him. And I would add, later in the hearing she's referred back to what happened with him previously, and this is something that I think is very important for the court. This defendant had just come under Ms. Thomas' supervision, only about four months earlier, after having been released on a sentence when his release was revoked. And why was it revoked? As she described it from reading the probation record, strong-arming a probation officer at a previous search, at a previous encounter, where she was challenging him for always returning right before his curfew, and he ended up being arrested and revoked on that. So I would just submit, and she said that was in her mind when she selected him, if I'm offered law enforcement resources as a probation officer to search a high-risk gang and sex offender defendant who was in prison for strong-arming a defendant, I would say yes to that, and I think anyone would say yes to that. So Courtney Thomas, his probation officer, was decisive in picking him for this search. She said she supervised about 60-plus sex offenders. She picked three or four for this operation, and she picked him for specific reasons relating to it. Now, she was not a participant in the search. Becky Staley was. But there were four probation officers that participated in this search. I assume that if it was just a pretext with regard to supervision, they wouldn't need to send their whole staff on the search. I think that's right. And like so many Fourth Amendment cases, it's all about the details. And the testimony at the hearing from Agent Wishon, the ATF agent who was there, so the team was nine people. Four of them were probation officers. A fifth of them was a State Department of Corrections animal handler, so that's pretty closely related. Then you had two local police, one deputy sheriff, one police officer, and two ATF agents. So overall, when you look at this, this is a primarily state official search and primarily probation. The probation officers led the search. Agent Wishon was asked about exactly how this went down. As I picture it, the door was at the top of a balcony and there was only a little room on the platform. On the platform at the top were the probation officers. Down below, they said they couldn't even see the door. The probation officers were the ones that knocked on the door. It was just them up there. Agent Wishon said they couldn't see the door when the door was knocked on. They could only hear. Then he was asked, were you giving directions at that time? His response, quoting him, was absolutely not. The probation officers were leading the search. They were running the search. This court, back to Majette, said very clearly that it's appropriate to have law enforcement assist in these searches. It's good for public policy. It's good for public safety to have law enforcement officers assisting in these searches. I think that's exactly right.  Yes, Your Honor. I think that's a very important limitation that North Carolina has put on this. That distinguishes some others. You have the North Carolina Court of Appeals case in Powell where they found that suppression was warranted in a case involving a law enforcement operation. This case makes a great comparison to that. The reason is, in Powell, his probation officer apparently didn't even know the search happened until he was asked to pick the defendant out of the police lineup after the search. Beyond that, when the agents were asked, why did you pick this person for the search? They basically said, well, it was basically random. We just picked some violent offenders, but I guess they weren't all violent, but it was kind of random. That's a far cry from probation officer Thomas's credited statements that Judge King, as you discussed with my colleague, that the magistrate judge found as facts, that those were her reasons. There's been a little bit on appeal of fighting about whether he was really in a gang or whether it was his brother's jewelry. It doesn't matter for this analysis because she considered those things to be true. He was designated to be in the gang at that time, and that was what she relied on in making the determination. Whether later on, this is not the right forum to challenge someone's gang designation in probation, nor is it the right forum to challenge whether it was really her brother's jewelry or not. The fact is, it led to her thinking it was appropriate to search him, and he was required to be searched very soon, and law enforcement help is appropriate. So we put all those together. Now, I strayed a little bit, Judge King, from what I said I was going to talk about, which was a probation officer versus my probation officer, but I think that background is helpful for it. So the statute says A. It says that, and it's very difficult to get around what the statute says because A is an indefinite article. I was drawn to look up the word A in the dictionary in preparing for this oral argument, and as an indefinite article, it means any of a category of things. In the briefing, my colleague said that they should have said any if they wanted it to be any, and two responses to that. The first is they essentially did, because A as an indefinite article means any of the category of people known as probation officers. But the second is there are times in these statutes when they do refer to the specific probation officer, and I would just direct the court, as an example, to 15A-1343b2, which is talking about regular conditions of probation. It says, remain within the jurisdiction of the court unless granted written permission to leave by the court or his probation officer. So there are times, and there's others. The provision right after it refers to his probation officer. There are other ones within the probation statute that refer to offender's probation officer. And then likewise, if you look also in 1343b, subsection 13 and 14, I think this is probably the most powerful demonstration. So these are probation search conditions that are very similar to what we have here. What is the reasonable relationship between this search and his supervision? It was that she felt he had conditions that required him to work and that required him not to engage in criminal conduct, and she felt like, based on her observations of him, that it seemed like there was a very likely explanation for why he would be wearing fancy jewelry, have expensive-looking shoes, but not have a job. Because if he had a legitimate job. Is it clear when she made that observation? It's not exactly clear. It appeared to me from the record that it was relatively close to the time of the search, especially since she said he was coming up on his 180 days. If she decided this three months earlier, I don't think she'd have thought that. And maybe when she's talking more like 45 days, that's what she's talking about, because the search was closer to 35. But I can't put a date. I don't think she put a date on it. And so in this section, 1343, it has a warrantless search provision by a probation officer of the probationer's person, et cetera, just like we're talking about here. The next provision says, submit to warrantless searches by a law enforcement officer of the probationer's person and probationer's vehicle upon reasonable suspicion. So a probation officer without reasonable suspicion, a law enforcement officer with reasonable suspicion. That reflects a deliberate choice by the assembly. And if a probation officer means a specific probation officer, then what do they mean by a law enforcement officer? I think what that suggests is they're not designating a particular law enforcement officer. They mean any, and they're not designating a particular probation officer. So on the plain language of this statute, this doesn't require the specific probation officer. And if it did, it was delegated here anyway. And I think it's important to think about the law enforcement assistance in these as providing for both public safety and, frankly, probation officer safety. And in order for the probation office to carry out these kind of searches, to really carry them out in a meaningful way, they need to be able to conduct them with assistance of their law enforcement partners. That's exactly what the North Carolina Court of Appeals said in Powell, and it's what this court said in Majette. And so I don't really see a distinction in this case just because Courtney Thomas wasn't present. She had been supervising him for four months. Becky Staley actually testified she did remember talking to Courtney Thomas about the search beforehand to learn about it. So I think a lot of stuff comes down to the details in this case, but ultimately you have a very clear statute that this court has already interpreted to find constitutional. I would also just, I want to note this court's decision, and I believe it was Kerr, goes to this idea, too, of overlapping interests. First of all, the agent was very clear that their interest was just in assisting. But even if you want to take it and say, well, they were also hoping to generate some federal cases out of this, even if you assume that for the sake of argument, that is also furthering the probation interest. And I say that because it was clear from the long suppression transcript that a lot of these searches are less thorough than others. Sometimes a warrantless search can involve walking in, looking in the door, maybe check a few drawers and walk out. When you have this kind of law enforcement resource assistance, you can do real searches, and offenders learn about that. And they know that the possibility that you might have a federal case come out of it if you have a gun during your post release supervision helps create deterrence so that people in post release supervision don't do that. And that fulfills the dual goals of supervision this court talked about in the JED. First, which is to help these offenders succeed, and second is to protect public safety. Those are probation's interests, and they're fully fulfilled by the participation of law enforcement. If the court doesn't have any further questions, I'd be happy to leave the rest of my time. Thank you very much. We ask that you affirm the judgment. Thank you very much, sir. Thank you. My friend's invocation of Majette. The idea that suspicionless searches are supported by a similar statute is actually just dicta in that opinion. In that case, there was a reasonable suspicion that Mr. Majette possessed firearms, so I think it's distinguishable on that basis. And turning to why Courtney Thomas selected JV on Scott, I'd direct the court's attention to JA84. When she was asked by the prosecutor, how did you become involved in that operation, she said, quote, we became involved based on our supervisors. They wanted to do searches of offenders that we had, so we were asked to pick offenders we wanted to conduct searches on. So this was not something that was coming from her, and there's good reason for that. She actually took Mr. Scott off of curfew. That's reflected at JA90. Mr. Scott was working, which is reflected at JA89, and Courtney Thomas testified she had no major issues with him, and that's at JA89 and JA91. So even though Mr. Scott had had a previous revocation, at the time he was supervised by Ms. Thomas, things were going well. He was doing well, and she recognized that by taking him off of his curfew, which is simply inconsistent with this idea that she somehow initiated and sought law enforcement assistance for what she believed would be a search of a particularly dangerous offender. I would also note my colleague invoked probation officer safety, and I think, of course, that's a legitimate concern, and if you have a supervising officer who contacts law enforcement asking for assistance, that is a very different case than this one. Here, in fact, the probation office set itself up to make its officers less safe. They were sending officers who were not familiar with and had not been briefed on the conditions of supervision applicable to each supervisee or familiar with that person's history and circumstances. So I think this method of organizing a search actually rendered them less safe. And just with respect to the press release, I'd also note, I believe that's at JA, I think it's in the 40s, 44, I would note Hope Mills Police Chief Joel Echardo's comment that he wanted to thank the U.S. Marshals Service for bringing this campaign to our community and for including the Hope Mills Police Department in the effort to remove dangerous fugitives from our streets. So I think everything in this case is pointing in one direction, which is that law enforcement officers were driving the train. A law enforcement objective was motivating. Well, the police chief was just trying to make it sound better to the public. They're out there doing a good job protecting everybody. Well, I think – Was this in Hope Mills? This particular search, I don't believe, was in Hope Mills, Your Honor. But I think the consistent message throughout both the press releases and the record in this case is that it was a law enforcement search that should have been subject to the balancing test of Sampson and Knights, and that by asking probation officers to be present, the government was attempting to get itself in under the Griffin line of cases, where if there is compliance with the special need, the search would be authorized. So we would ask this court to reject that interpretation, to reach the analysis under Knights and Sampson, and hold that because of the conditions to which Mr. Scott agreed, his reasonable expectation of privacy was violated in this case, and the evidence should be suppressed. If there are no further questions. Thank you very much, Ms. DeLauro. Thank you, Your Honor.
judges: Robert B. King, Barbara Milano Keenan, Joseph R. Goodwin